**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MICHELLE LUONGO, as Personal Representative of the Estate of ASHLEY FORWARD,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TOWN OF SAUGUS, OFFICER SEAN MURPHY, and SERGEANT MICHAEL RICHARDS,**<br><br>**Defendants.** | **Civil Action No. 24-12311-FDS** |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a wrongful death action arising out of a high-speed police pursuit that ended in a head-on collision. Plaintiff Michelle Luongo is the personal representative of the estate of Ashley Forward, a 19-year-old woman who was killed in the collision. William Leger, the driver of the car that collided with Forward's vehicle, was fleeing from the scene of a robbery in a stolen vehicle.

At the time of the collision, Leger was traveling at speeds of up to 85 miles per hour on the wrong side of Route 107 in Saugus. Sergeant Michael Richards of the Saugus Police Department was pursuing Leger in a marked police cruiser while traveling on the correct side of Route 107. Leger survived the collision and eventually pleaded guilty to manslaughter and other criminal charges arising out of the incident.

This Court (Talwani, J.) previously dismissed two claims against all defendants and one

claim against the individual defendants. *See* Mem. & Order 10 (Dkt. No. 29). What remains are two claims: (1) a wrongful death claim against the Town of Saugus and Sgt. Richards (Count 1) and (2) a claim under 42 U.S.C § 1983 against the Town of Saugus for violation of Forward's constitutional rights (Count 3). The defendants have moved for summary judgment as to both claims.

For the following reasons, summary judgment will be denied as to the claim for wrongful death (Count 1) and granted as to the claim under § 1983 (Count 3).

## I. Background

### A. Factual Background

#### 1. The Saugus Police Department's Vehicle Pursuits Policy

The Saugus Police Department maintains a Vehicle Pursuits Policy that applies to supervisors, detectives, patrol officers, and dispatchers. Ricciardelli Aff. ¶ 6 Ex. B, at ECF 1, 7 (Dkt. No. 40-1). The policy took effect on April 23, 2015. *Id.*

Under the policy, officers may pursue "any motor vehicle operating in conformance with posted speed limit and other traffic laws, under any circumstance justifying a lawful motor vehicle stop." Vehicle Pursuits Policy at ECF 8. (Dkt. No. 40-1). Officers are prohibited from engaging in a pursuit "that requires the Officer to exceed the posted or applicable speed limit or that involves a target vehicle operating in violation of the posted or applicable speed limit or other traffic laws" unless the officer "reasonably believes" one or more of the following criteria are met:

> That the continued operation of the vehicle the Officer intends to stop poses a risk of physical harm to the Officer, the public, or others;
>
> That the occupant(s) of the vehicle the Officer intends to stop pose(s) a risk of physical harm to the public or others; or

> That the occupant(s) of the vehicle is/are wanted for the commission of felonious acts that threaten, have threatened, or will threaten the health, life, or safety of a person or persons.

*Id.* The policy also prohibits officers from initiating or continuing a pursuit "on a divided highway opposite the direction of the flow of vehicular traffic." *Id.*

The policy sets forth various factors officers "should consider . . . when practicable" before concluding there is authorization for a pursuit "requiring or involving the violation of the posted speed limit or other traffic laws." *Id.* at ECF 9–10. Factors that may counsel in favor of authorization include the "severity of crime / offense" believed to have been committed by an occupant of the pursued vehicle; "the nature and degree of the threat to public safety" if the vehicle is not stopped; "alternatives" to a pursuit; and "whether the identities of the occupants are known to the point later apprehension is possible and applicable." *Id.* at ECF 10. Factors that may counsel against authorization include "population density" in the area; the "nature" of the area; an officer's "familiarity with the area[;]" the weather and road conditions; the time of day; the speeds and "performance capabilities" of the pursuing and pursued vehicles; and the "operational status" of the "emergency warning equipment" on the officer's vehicle *Id.* In considering those competing factors, the officer must ultimately consider "the risk to public safety *in the absence of pursuit* vs foreseeable risk to public safety *arising from the pursuit*[.]" *Id.* (emphases in original).

When an officer is the "primary unit" engaged in a pursuit, the officer "is vested with the authority to decide and direct the pursuit actions[,]" subject to a supervisor's instructions. *Id.* at ECF 11. The officer must "continually reevaluate and assess the pursuit" and "shall terminate the pursuit[,]" even without a supervisor's order to do so, when the officer "reasonably believes that the foreseeable risks to the Officer, the public or others arising from a continued pursuit is

greater than the threat to public safety" if the pursued vehicle escapes. *Id.* at ECF 11–12. If the pursuit is terminated, officers must "immediately reduce their speeds" to at or under the posted speed limit and "deactivate their emergency warning equipment." *Id.* at ECF 14. Officers may, however, continue to "operate their vehicles in the same direction as the previously pursued vehicle" if the officer "maintain[s] a safe distance" and the officer's "actions do not constitute an active attempt to continue the pursuit." *Id.*

Officers must file a written report for every pursuit in which they have engaged. *Id.* If a patrol supervisor is also engaged in a given pursuit, he or she must file a report "as a supplemental narrative." *Id.* The reports are then "evaluated and reviewed by a Superior Officer to determine if there has been compliance with departmental policies and regulations." *Id.* The Shift Commander must also complete a Pursuit Evaluation Form "prior to the end of the shift in which the pursuit occurred," which must be "submitted to the Chief of Police for review." *Id.*

A training officer for the Department must "conduct an annual analysis of all motor vehicle pursuits" involving the Department's officers, and the Department must "annually analyze pursuit activities" to identify any areas of improvements for, or necessary modifications to, the policy. *Id.* at ECF 14–15. The policy also requires that the Department "provide Roll Call Training" on the policy and "disseminate it through the avenues set forth" in the Department's Written Directives Policy. *Id.* at ECF 15.

2. **<u>The Events of June 9, 2021</u>**

At 10:47 a.m. on June 9, 2021, a Saugus Police Department emergency dispatcher received a call from individuals at a convenience store on Lincoln Avenue. Pl.'s Opp'n Ex. 1, at ECF 4 (Dkt. No. 45-1). The callers reported a robbery at the store, described the perpetrator as a black man wearing a blue shirt, and gave a partial license plate number for a gray Volkswagen in

which the man drove off. *Id.* The callers stated that they did not see a weapon and reported no injuries. *Id.*

At 10:49 a.m., Sgt. Richards spotted the Volkswagen and began following it. *Id.* at ECF 1. Because of the dispatcher's transmission about the robbery, Sgt. Richards was aware that "no weapon was shown" by the suspect while he was inside the store. DSUMF Ex. B, at 14:24–15:23 (Dkt. No. 40-2); *see* Ricciardelli Aff. Ex. A, at ECF 5 (Dkt. No. 40-1) (containing the call log, including a narrative stating: "911 caller reports a black male just robbed the store and fled down Lincoln Ave towards Lynn in a Silver Volkswagen. No weapon was shown.").

Approximately 38 seconds after he began following the car, Sgt. Richards reported to the dispatcher that he was "trying to stop" the car on "Ballard Street past Richard Street." Pl.'s Opp'n Ex. 1, at ECF 1 (Dkt. No. 45-1). Approximately 17 seconds later, he reported that "[the suspect was] not stopping[,] Ballard passing Houston [Street]." *Id.* The dispatcher responded roughly five seconds later, stating: "I'm showing that vehicle stolen out of Lynn[.]" *Id.; see* Richards Dep. 93–94 (Dkt. No. 40-2). While following the car on Ballard Street, Sgt. Richards was traveling at approximately 35 to 40 miles per hour. He had activated his cruiser's lights and siren. DSUMF ¶ 4 (Dkt. No. 40); Pl.'s Resp. to DSUMF ¶ 4 (Dkt. No. 44).

One minute and 15 seconds after the pursuit began, Sgt. Richards reported to the dispatcher that the Volkswagen was "coming up" on the intersection of Ballard Street and Route 107. Pl.'s Opp'n Ex. 1, at ECF 1 (Dkt. No. 45-1). Approximately nine seconds later, Sgt. Richards informed the dispatcher that the Volkswagen was traveling "in the northbound lane heading south on 107." Approximately 17 seconds later, he requested that the dispatcher contact Massachusetts State Police or local police in Revere "to maybe block [the car] off." *Id.* at ECF 2. Sgt. Richards turned onto the southbound lane of Route 107 and began driving down the road,

traveling in the same direction as the Volkswagen. DSUMF ¶¶ 8–9 (Dkt. No. 40); Pl.'s Resp. to DSUMF ¶¶ 8–9 (Dkt. No. 44); Richards Dep. 16–17 (Dkt. No. 40-2).

Route 107 in Saugus is a four-lane highway, with two lanes for northbound travel and two lanes for southbound travel separated by a median. Richards Dep. 17 (Dkt. No. 40-2). There are two "jughandle" cutouts between the northbound and southbound travel lanes that motorists can use to change direction. Murphy Dep. 28–30 (Dkt. No. 45-2). After the second jughandle, however, the northbound and southbound lanes are separated by a solid barrier, and there are no further opportunities for motorists to switch to the opposite travel lanes. Richards Dep. 27 (Dkt. No. 40-2); Murphy Dep. 30 (Dkt. No. 45-2).

Approximately one minute and 51 seconds after Sgt. Richards began following the Volkswagen, he made the following report to the dispatcher while traveling on Route 107:

> (1:51): Control I'm parallel to him. I'm going south. He's going south of [sic] the northbound lane. We're right near the testing site.
>
> (2:00): Speeds are about, he's probably going about 80, 85.

Pl.'s Opp'n Ex. 1 ECF 2 (Dkt. No. 45-1). By that point, the Volkswagen had driven beyond the second jughandle and could no longer turn into the proper travel lane, even if he wanted to do so. *See* Richards Dep. 21 (Dkt. No. 40-2); Murphy Dep. 30 (Dkt. No. 45-2). The lights and siren of the cruiser remained on. Richards Dep. 22 (Dkt. No. 40-2).[1]

According to defendants, although the Volkswagen accelerated to a speed of 80 to 85 miles per hour after passing the second jughandle, Sgt. Richards maintained a speed of "approximately 60 [miles per hour]." DSUMF ¶ 14 (Dkt. No. 40); *see* Richards Dep. 22 (Dkt. No. 40-2). Plaintiff contests that characterization, asserting that "[a]udio recordings of the

[1] Sgt. Richards could not recall if he may have "instinctively" turned off the siren when the collision occurred. *Id.* at 22.

pursuit" demonstrate that Sgt. Richards "continued to aggressively chase [the driver], accelerating and matching [his] speed, so that Richards was driving 'parallel' to [him] during the chase on 107[.]" Pl.'s Resp. to DSUMF ¶ 14 (Dkt. No. 44); Pl.'s Opp'n Ex. 1, at ECF 1–2 (Dkt. No. 45-1).

Two seconds after transmitting the Volkswagen's estimated speed, Sgt. Richards reported that the car "just crashed. He just wrecked[.]" Pl.'s Opp'n Ex. 1 ECF 2 (Dkt. No. 45-1). He requested "at least two or three ambulances[,]" and asked for "107 Northbound" to be "shut off[,]" *Id.*

The Volkswagen had collided head-on with a vehicle driven by Ashley Forward, who was traveling in the proper direction on the same side of Route 107. Richards Dep. 24–25 (Dkt. No. 40-2). Forward was killed in the crash.

Emergency medical personnel and other Saugus police officers arrived on the scene shortly thereafter. *See* Murphy Dep. 33–35, 40 (Dkt. No. 45-2). The driver of the Volkswagen "was conscious" but "in tremendous amounts of pain." Richards Dep. 25–26 (Dkt. No. 40-2). Sgt. Richards identified him as William Leger after asking for his name and date of birth. *Id.* Leger was arrested and transported to Massachusetts General Hospital, accompanied by Officer Sean Murphy. Murphy Dep. 65 (Dkt. No. 45-2).

On July 27, 2021, Lt. Steven McDonald, the Saugus Police Shift Commander on duty on June 9, completed a Pursuit Evaluation Form for the pursuit. Pl.'s Opp'n Ex. 4, at 1–3 (Dkt. No. 45-4). On the form, Lt. McDonald selected "suspect m[otor] v[ehicle] crashed" as the "reason for termination of pursuit[,]" as opposed to "suspect m[otor] v[ehicle] willingly stopped" or "became disabled[,]" "termination ordered by [a] shift commander [or] patrol supervisor[,]" or decision by the "pursuing officer[.]" Pl.'s Opp'n Ex. 4, at 2 (Dkt. No. 45-4) (capitalization

omitted). In the report's written comments, he offered the following description: "Stolen suspect m/v turned from Ballard Street onto the Salem Turnpike (Rte 107) on the wrong side of the divided roadway and continued in the wrong direction and ultimately caused a fatal head on collision." *Id.* at 3.

Chief Ricciardelli reviewed and signed Lt. McDonald's report on July 29, 2021. *Id.* No disciplinary action was taken against Sgt. Richards. Richards Dep. 65–66 (Dkt. No. 40–2).

### B. <u>Procedural Background</u>

Michelle Luongo, as the personal representative of the estate of Ashley Forward, filed this action in state court. The complaint asserted four claims: (1) a claim for wrongful death against the Town of Saugus, Officer Murphy, and Sgt. Richards (Count 1); (2) a claim for wrongful death against Leger (Count 2); (2) a claim under 42 U.S.C. § 1983 for violations of Forward's rights under the Fourth and Fourteenth Amendments to the United States Constitution against the Town of Saugus, Officer Murphy, and Sergeant Richards (Count 3); and (4) a claim for violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 111, against the Town of Saugus, Officer Murphy, and Sgt. Richards (Count 4).

Defendants removed the case to this court, answered the Complaint as to Count 1, and moved to dismiss Counts 3 and 4.

On May 28, 2025, the Court (Talwani, J.) dismissed the claim against Leger without prejudice under Fed. R. Civ. P. 4(m) for failure to serve Leger and, alternatively, under Fed. R. Civ. P. 41(b) for failure to prosecute.

On June 2, 2025, the Court (Talwani, J.) denied the motion to dismiss as to Count 3 against the Town of Saugus; granted the motion as to Count 3 against Officer Murphy and Sgt. Richards; and granted the motion as to Count 4 as to all three defendants.

Defendants have now moved for summary judgment on the remaining claims. At the hearing before the Court on the motion, plaintiff voluntarily dismissed all claims against Officer Murphy. The only remaining claims are against the Town of Saugus (Counts 1 and 3) and Sgt. Richards (Count 1).

## II. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Burt v. Board of Trs. of Univ. of R.I.*, 84 F.4th 42, 59 (1st Cir. 2023) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 510 (1st Cir. 2023) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)) (citation modified).

In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation modified). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

## III. Analysis

### A. Count 1 (Wrongful Death)

Count 1 asserts claims against the Town of Saugus and Sgt. Richards under the

Massachusetts wrongful death statute, Mass. Gen. Laws ch. 229, § 2. The statute provides, in relevant part, that liability is premised upon a finding of negligence. *Id*. (a "person who . . . by his negligence causes the death of a person . . . shall be liable in damages"); *see Gianocosta v. Interface Grp.-Mass., Inc.*, 450 Mass. 715, 727 n.13 (2008) ("To prevail on a wrongful death claim, pursuant to Mass. Gen. Laws ch. 229, § 2, a plaintiff must prove negligence . . . on the part of the defendant, that caused the death of a person.").

Negligence actions against public employers and public employees are governed by the Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258, § 1 *et seq*., which is the exclusive remedy available under state law. *Id*. § 2. The MTCA provides that public employers "shall be liable for personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances[.]" *Id.*

Although the MTCA includes a limited abrogation of the Commonwealth's sovereign immunity, that abrogation does not apply to

> any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.

*Id.* § 10(j). That exception, in turn, does not apply to "any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention." *Id.* § 10(j)(2).

"[T]here are two parts to the 'original cause' test where harm is inflicted by a third party. First, there must be 'an affirmative action; a failure to act will not suffice. . . .'" *Baptista v. Bristol County Sheriff's Dep't*, 100 Mass. App. Ct. 841, 854 (2022) (quoting *Cormier v. Lynn*, 479 Mass. 35, 40 (2018)). "Second, [i]n order for a public employer's affirmative act to be the

'original cause' of a 'condition or situation' that results in harmful consequences to another from the 'violent or tortious conduct of a third person,' . . . the act must have materially contributed to creating the specific 'condition or situation' that resulted in the harm.'" *Id*. at 854–55 (quoting *Kent v. Commonwealth*, 437 Mass. 312, 319 (2002)).

Plaintiff asserts that the Town and Sgt. Richards "breached their duty of care, violated ordinary standards or care, and were negligent by causing the collision" in which Forward was killed. Compl. ¶ 31 (Doc. No. 1-2). The claim is based on defendants' alleged "fail[ure] to adhere to proper police protocol regarding initiation and continuation of a high speed chase, driving at a speed in excess of the posted speed limit, operat[ion of] a vehicle the wrong way on a public way, and opera[tion of] the vehicle in a reckless manner." *Id*. at ¶ 32.

Construing the record in the light most favorable to plaintiff, there are genuine disputes of material fact as to whether Sgt. Richards's conduct "materially contributed" to the conditions that resulted in the collision. In particular, there is a dispute as to whether Sgt. Richards terminated his pursuit once Leger began driving the wrong way on Route 107 and, if so, when that termination occurred.

In his deposition testimony, Sgt. Richards asserted that he terminated the pursuit once Leger drove past the second "jughandle" turn and was effectively trapped on the wrong side of Route 107. Richards Dep. 77–78 (Dkt. No. 40-2). Other parts of the record, construed in the light most favorable to the plaintiff, tend to cast doubt on that characterization. The Pursuit Evaluation Form, for example, lists the "reason for termination of pursuit" as "suspect m[otor] v[ehicle] crashed[,]" rather than a termination initiated by the pursuing officer or ordered by a supervisor. Pl.'s Opp'n Ex. 4, at 2 (Dkt. No. 45-4) (capitalization omitted). Sgt. Richards also

did not turn off his cruiser's lights, as required under the Vehicle Pursuits Policy upon termination of a pursuit. Vehicle Pursuits Policy ECF 14 (Dkt. No. 40-1).

Whether Sgt. Richards, once on Route 107, maintained his cruiser's speed or accelerated to keep up with Leger is also in dispute. Both the testimony of Sgt. Richards and the Pursuit Evaluation Form indicate that the speed of his cruiser did not exceed 60 or 65 miles per hour. *See* Richards Dep. 24-25 (Dkt. No. 40-2) ("Q: Okay. Do you have any idea how fast you were going?; A: 60, perhaps."); Pl.'s Opp'n Ex. 4, at 2 (Dkt. No. 45-4) (listing Sgt. Richards's approximate maximum speed as "60-65 on Rte 107"). In his communications with the emergency dispatcher, however, Sgt. Richards stated that he was "parallel to [Leger][,]" and the audio recording of this call contains sounds that are arguably consistent with acceleration of his cruiser just prior to the collision. His subsequent statement to dispatch that "[s]peeds are about, [Leger's] probably going about 80, 85[,]" *id.*, is arguably ambiguous as an indication of whether he was traveling at a speed approaching that of Leger.

Taken together, those factual disputes give rise to competing inferences as to whether Sgt. Richards took "affirmative action[s,]" *Cormier*, 479 Mass. at 40, during his pursuit of Leger that "materially contributed to creating the specific condition or situation" that resulted in the collision, *Kent*, 437 Mass. at 319. Whether the Town of Saugus is immune from suit under the MTCA likewise cannot be determined without resolution of these factual disputes. Accordingly, the motion for summary judgment will be denied as to Count 1.

**B. Count 3 (Violation of Constitutional Rights under 42 U.S.C. § 1983)**

Count 3 asserts a claim against the Town of Saugus under 42 U.S.C § 1983 for violation of Forward's constitutional rights under the Fourteenth Amendment. Compl. ¶¶ 36–40 (Dkt. No.

1-2).[2] The complaint specifically alleges that the high-speed chase leading to Forward's death "resulted from [the] Town's failure to train, supervise, and discipline its officers[,]" ultimately depriving Forward of her right to life without due process of law. *Id*. at ¶ 40.

Section 1983 "creates a private right of action for redressing abridgements or deprivations of federal constitutional rights." *McIntosh v. Antonino*, 71 F.3d 29, 33 (1st Cir. 1995). "A claim under § 1983 has two 'essential elements': the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008). The second element requires the plaintiff to show that the defendants caused the alleged deprivation. *Id*. "[A] person injured as a result of police misconduct may prosecute a substantive due process claim under [S]ection 1983." *Evans v. Avery*, 100 F.3d 1033, 1036 (1st Cir. 1996).

Although a governmental entity may be considered a "person" for purposes of § 1983, it cannot be held liable for the acts of its employees on a *respondeat superior* theory. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978); *Salcedo v. Town of Dudley*, 629 F. Supp. 2d 86, 104–05 (D. Mass. 2009). A governmental entity may, however, be held liable for constitutional violations if those violations are the result of an official policy or custom. *Monell*, 436 U.S. at 694. The local government's policy or custom must be "'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Polk Cnty v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, 436 U.S. at 694).

To constitute a violation of substantive due process, state action must be "so egregious, so

---

[2] In the complaint, plaintiff's § 1983 claim was also predicated on a violation of Forward's Fourth Amendment right to be free from unreasonable seizures. The Court (Talwani, J.) previously dismissed the § 1983 claim to the extent that it was based on the Fourth Amendment. *See* Mem. & Order 3–4 (Doc. No. 29).

outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). "Executive branch action that sinks to the depths of shocking the contemporary conscience is much more likely to find its roots in 'conduct intended to injure in some way unjustifiable by any government interest.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005) (quoting *Lewis*, 523 U.S. at 849). By contrast, "negligently inflicted harm is 'categorically beneath the threshold' of a constitutional violation." *Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 53 (1st Cir. 2006) (quoting *Lewis*, 523 U.S. at 849).

Situations where the alleged wrongdoing amounted to "deliberate indifference" present "closer calls." *Id.* The First Circuit has cautioned that "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior *may* suffice to shock the conscience." *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005) (emphasis added). However, "[t]hat determination . . . is context specific" and "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Ramos-Pinero*, 453 F.3d at 53.

The parties dispute whether the higher "shock the conscience" standard or the lower "deliberate indifference" standard should control with respect to Sgt. Richards's alleged conduct. *See* Mem. ISO Mot. for Summ. J. 9–10 (Dkt. No. 39); Opp'n 8–9 (Dkt. No. 45). Regardless of the appropriate standard, however, the evidence falls well short of establishing that the Vehicle Pursuits Policy was the "moving force" of any constitutional violation arising from the pursuit. *Polk Cnty*, 454 U.S. at 326 (quoting *Monell*, 436 U.S. at 694).

As described above, the Policy permits officers to engage in pursuits requiring excessive speeds or involving vehicles operating in violation of traffic laws only in limited circumstances. Vehicles Pursuit Policy ECF 8 (Dkt. No. 40-1). The Policy requires officers to consider various

situation-specific details before engaging in such a pursuit, including the nature and severity of the vehicle occupant's alleged crime, "whether the identities of the occupants are known to the point later apprehension is possible and applicable[,]" and a number of factors going to the "foreseeable risk to public safety arising from the pursuit." *Id.* at ECF 10. And it requires officers to "continually reevaluate and assess" any pursuit once it begins. *Id.*

The record does not support the contention that the Town, through the Saugus Police Department, failed to properly train, supervise, or discipline the officers as to the Vehicle Pursuits Policy. Both Sgt. Richards and Officer Murphy testified to their familiarity with, and knowledge of, the Policy. Richards Dep. 33–37 (Dkt. No. 40-2); Murphy Dep. 73 (Dkt. No. 45-2). Officer Murphy indicated that he received training on pursuits and the Policy during "field training" after graduating from the Massachusetts police academy. Murphy Dep. 13–14 (Dkt. No. 45-2). Sgt. Richards testified that he engaged in Roll Call Training on the Policy with his subordinates both before and after the fatal crash in June 2021. *See* Richards Dep. 91 (Dkt. No. 40-2). Officers with the Saugus Police Department are also required to "sign[] off on" the Policy, which is disseminated through the Chief of Police. *Id.* at 92.

Plaintiff argues that there is a "contradiction[]" between "Officer Murphy's understanding that the pursuit should have been terminated when Leger entered Route 107 and Sergeant Richards' testimony that he continued the pursuit[,]" indicating "improper and/or inadequate training regarding the department's pursuit policies." Opp'n 11 (Dkt. No. 45). But a single instance of an officer's misjudgment in rapidly evolving circumstances—assuming there was a misjudgment—is not sufficient evidence to demonstrate a constitutionally invalid failure to train or supervise.

Furthermore, and in any event, the testimony of Sgt. Richards and Officer Murphy is

substantially more nuanced than plaintiff suggests. Sgt. Richards testified that he stopped the pursuit when Leger's vehicle passed the last "jughandle" on Route 107 due to safety concerns. Richards Dep. 77–78 (Dkt. No. 40-2). He stated that he continued "trying to keep a visual on [Leger] and just f[e]ll back and hopefully nothing crazy happens." *Id.* at 78. When asked his understanding of "when [the pursuit] was terminated[,]" Officer Murphy responded: "When Sergeant Richards had like fallen back at that point[,]" in reference to the pursuit's transition onto Route 107. Murphy Dep. 60 (Dkt. No. 45-2). Officer Murphy stated that he would have expected Sgt. Richards to have terminated the pursuit when Leger entered Route 107, but he also believed that Sgt. Richards's continuation down Route 107 did not constitute a pursuit. *See id.* at 61. That distinction aligns with the Vehicle Pursuits Policy, which permits officers to "operate their vehicles in the same direction as the previously pursued vehicle" if the officer travels at or under the speed limit, "maintain[s] a safe distance[,]" and does not take actions that "constitute an active attempt to continue the pursuit." Vehicle Pursuits Policy ECF 14.

Plaintiff's reliance on *Boveri v. Town of Saugus*, 113 F.3d 4 (1st Cir. 1997), is misplaced. In *Boveri*, a motorist sued the Town of Saugus for substantive due process violations under 42 U.S.C. § 1983 after he was severely injured when a suspect fleeing from Saugus police officers collided with the motorist's vehicle. *Id.* at 5–6.

Plaintiff asserts that *Boveri* sufficiently placed the Town "on actual notice . . . that police pursuits present a well-recognized and recurring danger to the public" and "that officer decision-making during pursuits carries life-or-death consequences for third parties." Opp'n 12 (Dkt. No. 45). But the existence of the Vehicle Pursuits Policy is an express acknowledgement of that danger, and its specific terms provide a reasoned response. The connection between *Boveri* and the facts of this case is also tenuous where the Policy in effect at the time of Forward's death was

instituted in 2015—25 years after the pursuit at issue in *Boveri*, 113 F.3d at 5—and where defendants have submitted an affidavit from the Chief of Police indicating that no other pursuit by a Saugus officer has resulted in an injury to a third party since 1995. *See* Ricciardelli Aff. ¶ 4 (Dkt. No. 40-1) (stating in an affidavit dated November 20, 2025, that "[i]n my three decades with SPD, other than the incident regarding Ashley Forward, I know of no SPD pursuit that resulted in an innocent bystander being injured (let alone fatally).")

In sum, there is insufficient evidence from which to conclude that any violation of Forward's right to substantive due process under the Fourteenth Amendment resulted from an official policy or custom of the Town of Saugus under *Monell*, 436 U.S. at 694. Accordingly, the motion for summary judgment will be granted as to Count 3.

### C. <u>Exercise of Supplemental Jurisdiction</u>

Because the Court is granting summary judgment as to the only remaining federal claims, it must consider whether to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3). "In deciding whether or not to retain jurisdiction on such an occasion, the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir. 1996). Where, as here, discovery is closed, and the summary judgment process has concluded, judicial economy, convenience, and fairness normally favor the exercise of such jurisdiction. *Id.* Under the circumstances presented here, the Court will exercise such supplemental jurisdiction rather than remand the matter to the Superior Court.

## IV. <u>Conclusion</u>

For the foregoing reasons, the motion of defendant Town of Saugus for summary judgment is GRANTED as to Count 3 and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated: September 23, 2026